# EXHIBIT G

## Lily Korman

**From:** Mike Hughes [mwhughes@sandproof.org]
**Sent:** Wednesday, November 08, 2006 5:46 AM
**To:** BGolob@duanemorris.com
**Cc:** masoud@kemmgroup.com; masoudmkamali@yahoo.com; 'David Heckadon'
**Subject:** Masoud Kamali & Sprint lawsuit against Vonage

Barry Golob
Duane Morris LLP
1667 K Street NW
Washington DC 20036
(202) 776-5236
bgolob@duanemorris.com

Subject: Masoud Kamali & Sprint lawsuit against Vonage

Dear Barry,

Masoud Kamali, President of Kemm Consulting, asked me to speak with you regarding a patent infringement lawsuit brought against Vonage by Sprint last year. Specifically, he asked me to clarify why we have taken an interest in this case, what we can offer Vonage, and what we expect to gain from our efforts. Note that what I say below is based on personal experience, is confidential and should not be disclosed outside of Vonage without my approval.

**What is our interest in Sprint's suit against Vonage?** ISDN, explosive telecom growth and an entrepreneurial management approach within Telco's during the 1990's created opportunities for personal profit within Telco R&D departments. We found that this was especially true at Sprint, where unscrupulous persons sought personal gain at the expense of their employers and the suppliers with whom they dealt. At Sprint, this greed was amazingly well orchestrated and took the following forms:

1. Collusion between Sprint employees and preferred subcontractors for personal gain
2. Sprint employees fraudulently entering into a consulting contract with my company, Anonymix, with the intent of using this contract to extort equity and other property from me
3. Sprint employees attempting to bribe suppliers (me) to perform criminal acts on their behalf
4. Funneling by Sprint personnel of confidential Anonymix, Kemm, Sprint and Sprint supplier materials to their own companies for personal gain
5. Embezzlement of Sprint funds, documents and probably software entrusted to Sprint representatives
6. Racketeering patterns of behavior and tactics that, according to them, extended across multiple telecom companies
7. Failure to acknowledge the CCM (softswitch) patent invention contributions of Anonymix employees without which CCM would not have been functional.

At considerable cost, we resisted their advances. Since we did not have the money or the bandwidth to sue Sprint and pursue simultaneous business goals and we could not get legal authorities to investigate, we forsook Sprint's business and decided to focus on other opportunities. But we never forgot and have kept our eyes open for an opportunity to punish Sprint and the individual perpetrators.

Sprint's suit against Vonage may offer such an opportunity, since we believe we have knowledge and skills that could help defeat Sprint and perhaps expose a history of corrupt and racketeering-

1/29/2007

like practices. The fact that Sprint sued Vonage makes it even more attractive. I admire Vonage for its VOIP leadership, and I have been a fan of Jeffrey A. Citron since I started using Datek as one of my brokers in 2000. I felt that Datek was an outstanding company with the sound goals and am confident that Vonage fits a similar mold.

**How can we help Vonage?** Specifically, we are aware of history that may not be available to Vonage and we have knowledge that can prove that

1. Anonymix and Kemm Consulting personnel made key contributions to CCM and other patents submitted by Sprint that were not documented in the patent. Without these contributions, the subject inventions would not have been functional.
2. Sprint might not even own the subject patents, since Anonymix was not hired to invent these products and Sprint entered into the contract under false pretenses.
3. Sprint abused the patent by knowingly allowing a third party to develop and freely sell products incorporating this patent.
4. Not all of the patent claims were novel.
5. Based on what they told us, this behavior was rampant, not just at Sprint, but in other telecom companies. At the time, they built their support network by getting people to compromise themselves, thus gaining controlling leverage that would ensure further participation and silence. We believe that we know where some of the bodies may be buried, the uncovering of which would prove very embarrassing to Sprint.

**What do Mr. Kamali and I hope to gain?** Besides personal satisfaction, we would expect to be paid a consulting fee for time spent producing the proof. This might represent as much as four man-months of work, plus travel. Also, we would expect additional compensation, dependent on Vonage's success in rebuffing the Sprint suit. This might involve cash, but could also take the form of Vonage stock or implementation of complementary product concepts.

Hopefully, the above provides sufficient information for you to decide whether it is worth meeting with us. I look forward to hearing from you.

Sincerely,

Michael Hughes
831 359-4081

Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

1/29/2007