# EXHIBIT 1

Ball, Harley                HIGHLY CONFIDENTIAL                March 29, 2007
                              Kansas City, MO

Page 146

1   Do you see that?
2   A. Yes.
3   Q. What does that mean?
4   A. I don't know.
5   Q. Okay. What does built end-to-end
6   with Cisco equipment mean?
7   A. Generally, end-to-end would mean
8   from one end of the equipment with others. And
9   Cisco would be part of that.
10  Q. Does it mean that each component in
11  the architecture is a Cisco component?
12  A. Not necessarily.
13  Q. Okay. Did Sprint ever deploy the
14  IP Next-Generation Network?
15  A. According to this sentence, but I'm
16  not aware.
17  Q. Okay. Are you aware of whether
18  Sprint provides voice over the Internet services to
19  others?
20  A. It's my understanding that we do
21  employ some voice over Internet services.
22  Q. Okay. Does Sprint contend the

Page 147

1   provision of the VOIP services comes within the
2   scopes of any of the asserted patents in this case?
3   MR. WEBB: Objection. It's far outside
4   the scope of the 30(b)(6) notice.
5   The witness can answer based upon his own
6   knowledge if he knows.
7   A. I'm not aware of whether or not
8   they do.
9   MR. McPHERSON:
10  Q. Have you ever directed anybody at
11  Sprint to do an analysis of whether the services
12  Sprint provides comes within the scopes of the
13  patents asserted in this case?
14  A. No.
15  Q. Are you aware of whether Sprint
16  ever provided VOIP services to a customer?
17  MR. WEBB: Same objection.
18  A. It is my understanding we employ
19  some voice over IP services in our network.
20  MR. McPHERSON:
21  Q. When did that first begin?
22  A. I don't know.

Page 148

1   Q. If we go back down to the paragraph
2   under the heading Sprint and Cisco renew strategic
3   alliance, with reference to the alliance that was
4   first established in December 2001, did Sprint
5   license any of its technology to Cisco?
6   A. No.
7   Q. And how do you know that?
8   A. I would have been consulted
9   associated with any licensing.
10  Q. Okay. And when is the last time
11  you reviewed that agreement?
12  A. The -- I don't know.
13  Q. Okay. But you are aware there is
14  no licensing of technology of Sprint to Cisco in
15  that agreement?
16  A. That's my understanding.
17  Q. All right. How did you gain that
18  understanding?
19  A. Because I would have been consulted
20  in any license agreement associated with our
21  intellectual property.
22  Q. Okay. And with respect to the

Page 149

1   three-year extension of that strategic alliance
2   referenced in the same paragraph, did it include
3   any licenses of the Sprint technology?
4   A. That's not my understanding.
5   Q. And that's based upon your
6   recollection that you were not consulted regarding
7   those licenses. Is that correct?
8   A. Exactly.
9   Q. Was one of the purposes of the
10  strategic alliance entered into in December of 2001
11  to allow Sprint to provide VOIP services?
12  A. I don't know.
13  Q. Who would know the answer to that
14  question?
15  A. I don't know.
16  (Exhibit Ball 008, the last sentence says,
17  "As the 8, Cisco Sprint Extend Alliance, 7/11/05, was
18  marked for identification by the court reporter.)
19  THE REPORTER: I've marked Exhibit
20  Ball 008.
21  (The reporter hands a document to the witness.)
22  MR. McPHERSON:

38 (Pages 146 to 149)