# EXHIBIT Q-1

Dockets.Justia.com



# Equity Research
*Industry Update*

June 2002                                                                                          Telecom & Media/Regulatory

# Battle of the Bundles:
## *Packaging of Services to Accentuate Two-Wire Dominance*

SUMMARY: Evolving regulatory and market conditions are leading communications industry players increasingly to offer various bundles of voice, video, and data services, changing the competitive landscape throughout the sector. We believe the Bells and cable, as the dominant network providers, are best positioned to benefit in the bundling battle.

- **Bell and Cable Packages:** As they complete the Sec. 271 long-distance entry process, the Bells soon will be able to bundle long-distance, local, wireless, and various Internet-access services. Technological and business developments are enabling cable to bundle packages of video, broadband Internet access, and, increasingly, telephony services.

- **Lessons Learned:** Bundling carries upfront costs, but the evidence so far is that it also reduces churn, increases the take from a consumer's spending, and over time may cut costs.

- **Industry Impact:** We believe such integrated offerings will give the Bells and cable another advantage over competitors with limited product lines — IXCs, CLECs, rival wireless carriers, and DBS satellite providers — increasing pressure for consolidation. In the heavyweight showdown, we believe that the Bells will have a short-term marketing edge but cable will have a long-term cost advantage. We note that each side currently has a key piece missing: for the Bells, it's video; for cable, it's often telephony and particularly wireless. We believe cable has more options for filling its voids than do the Bells.

- **Survive or Thrive?** Whoever wins, industry prosperity will depend on whether the companies can convince consumers to pay more for additional services, or whether bundling simply will drive prices down across the board, reducing everybody's margins.

Blair Levin                           David Kaut                          Michael J. Balhoff, CFA
(202) 778-1595                        (202) 778-4341                      (410) 454-4842
blevin@leggmason.com                  dpkaut@leggmason.com                mbalhoff@leggmason.com

**Legg Mason Wood Walker, Inc. Telecommunication Research Team**

*Equity Research Group*

| | | | | | |
|---|---|---|---|---|---|
| Sean P. Butson, CFA | Blair Levin | Michael J. Balhoff, CFA | Daniel Zito | Timm P. Bechter, CFA | Cato Carpenter |
| Craig A. Mallitz | Rebecca Arbogast | Christopher C. King | Bradley Wilson | Mark L. Hall, CPA | Shlomo Rosenbaum |
| Tahmin Clarke | David Kaut | Bradley P. Williams | | | |

Legg Mason Wood Walker, Inc. - Legg Mason Headquarters - P.O. Box 1476 Baltimore, MD 21203 - Member New York Stock Exchange, Inc. - (410) 539-0000

# *Bells, Cable, Others Look to Bundle and Increase Reach, But Will They Prosper in Process, or Just Have Margins Cut?*

## I. OVERVIEW

Over the next few years, the owners of the two dominant communications networks — the regional Bells (BLS, SBC, Q, and VZ) and the major cable multisystem operators, or MSOs (T, CMCSK, COX, CHTR, AOL, CVC) — will enjoy an increased ability to sell new and enlarged bundles of services to their residential customers. For the Bells, the change will come through the completion of their Section 271 long-distance approval process. For the cable MSOs, the change will come through a combination of further footprint clustering, mergers, and technology changes that improve the industry's ability to offer voice services.

As one considers the industry's prospects, a critical question, then, is how will this battle of the bundles affect consumer spending on residential telecom and related services? We believe it will be some time before a majority, or even a large plurality, of consumers changes its buying patterns. We believe there are a variety of obstacles to bundles becoming attractive to consumers and profitable for the companies. Nonetheless, we believe that the providers increasingly will bundle their services and that enough consumers will buy these packages to eventually alter the playing field for:

- the wireless market, giving an in-region advantage to wireless providers affiliated with incumbent local exchange carriers (ILECs), most notably the Bells, and to a lesser extent, Sprint;

- competition between vertically integrated providers and providers with more limited product offerings, giving an advantage to the vertically integrated providers;

- the heavyweight showdown between the Bells and cable, in which the Bells will have a short-term marketing advantage that they hope to lock in, particularly in the voice market, but with cable enjoying a long-term cost advantage; and

- the way consumers think about the services they are buying, with the value proposition moving from the transmission of information over different vertical platforms to the integration of their communications services across multiple platforms.

This report describes the current bundles and the lessons that can be drawn from the experience to date. It also examines the future of bundles, critical issues affecting how effectively the companies can bundle their products, and how bundling will affect communications markets. It further notes some wild cards that can affect the market impact of bundling.

Case 2:05-cv-02433-JWL    Document 220-21    Filed 06/12/2007    Page 4 of 7

Battle of the Bundles
Industry Update — June 2002                3                Legg Mason Wood Walker, Inc.

## II. BUNDLES TODAY

Bundles today are at a fairly rudimentary level, as regulation and technology constraints have limited the different companies' ability to offer packages of services effectively. We have provided a synopsis of the different companies' bundles in the Appendix to this report. Below, we summarize our review of the bundles of the different communications segments.

**ILECs.** The Bells are just starting to focus on marketing the bundle of local, long-distance, Internet-access, and wireless services. In the past, regulation limited the bundling opportunities, but the completion of the Sec. 271 long-distance entry process is eliminating that constraint. Another limit was the reluctance of the affiliated wireless companies to be bundled, as they regarded themselves as fast-growing entities that did not need help in marketing. We understand from several sources that the wireless Bell affiliates now welcome the help with marketing and churn reduction. The Bells are now putting together packages that provide one-bill options with modest price reductions for taking additional services. To a certain extent, the most telling examples of the potential of bundles were two ILECs that were not regional Bells— Sprint (FON, PCS) and Cincinnati Bell, a unit of Broadwing (BRW) — and which thus did not have the long-distance restrictions. Sprint has had much greater success selling its wireless and long-distance products where it is an ILEC, with the wireless penetration rate 50% higher and the long-distance penetration rate 500% higher where bundled with the incumbent local service. Cincinnati Bell underwent a major corporate restructuring to facilitate its bundling efforts. It has achieved, among other results, a 70% long-distance market share and a wireless churn rate (1.6%) about one-half that of the industry average.

**Cable.** The main cable bundling focus thus far has been to thwart additional inroads by direct broadcast satellite (DBS) providers DirecTV (unit of Hughes/GMH) and EchoStar (DISH). The upgrade to digital has brought most cable video offerings largely on par with the DBS video product in terms of channel offerings and pricing, while cable's high-speed data service is deemed superior to the current DBS solution (which has limited upstream speeds). The addition of voice telephony to the MSO bundle — at this point primarily Cox (COX) and AT&T Broadband (currently part of T) — will provide the cable operators with a "triple threat" of video, data, and voice that the satellite and ILEC combatants will have a complex and difficult time matching, in our view. Cox's experience demonstrates a significant opportunity for cable, as it has made major inroads where it has offered telephony. Other cable operators, however, may have a hard time duplicating Cox's performance, as Cox started bundling with advantages of a better network and a better reputation for customer service. In addition to reducing churn and developing customer loyalty to their platforms, we believe that the promotional discounts offered by cable operators through bundling has increased customer trials of digital cable, high-speed data, video-on-demand, and telephony. As cable offers additional services at marginal prices that are deeply discounted from à la carte offerings, consumers have indicated a willingness to try new products that they normally would not purchase on a stand-alone basis.

**Broadband Service Providers.** There is one public and about a dozen privately held broadband service providers (BSPs), which, for the most part, have designed their networks from the start

Case 2:05-cv-02433-JWL   Document 220-21   Filed 06/12/2007   Page 5 of 7

Battle of the Bundles
Industry Update — June 2002                    4                    Legg Mason Wood Walker, Inc.

to be able to offer voice, video and data services. Their business plans are premised on the assumption that customers want to buy bundles and that they can become the low-cost provider of that bundle. All of these companies have regional footprints, and they have collectively invested about $5 billion in their networks to date. While they currently are unable to expand rapidly due to a variety of factors including capital constraints, they claim to pass approximately four million homes. Most interesting, in our view, is that they claim to have over one million customers, meaning they average a penetration rate of about 25%. This suggests that bundles have great appeal to consumers and that both cable and the ILECs could be vulnerable to new competition. The BSPs, in our view, would have to overcome both regulatory hurdles (particularly many local governments' control of rights of way) and investor skepticism to have a major impact on the market, but they represent a force that could accelerate the battle of the bundles.

**Limited Service Providers.** The other major players also have tried to take advantage of bundling, though they operate at a disadvantage to those with more robust networks and greater existing market penetration.

- *DBS*. There have been several efforts to bundle DBS satellite with wireline telco services through joint-marketing agreements. While they have had minimal impact in the past, we think that the DBS providers and the telcos have a stronger incentive to make such agreements work, as both now are more concerned about the impact of a full cable bundle. Nonetheless, we believe DBS always will be at a disadvantage with the bundle, as it is unlikely to ever be able to offer an efficient fixed or mobile voice service on its own platform.

- *Non-ILEC Wireless*. AT&T Wireless (AWE), Nextel (NXTL), VoiceStream (a subsidiary of DT) and Leap Wireless (LWIN) do not have an affiliation with an ILEC that facilitates a natural bundle with a wired service. To some extent, they are banking on wireless replacing wired, so that the bundle of local, long distance, and wireless will be done on a consumer's wireless phone. While this is an important trend, it may not happen fast enough to protect the market share of the non-ILEC wireless providers, nor does it account for Internet access and video becoming critical parts of the bundle. If a significant number of customers want those services as part of a bundled offering, pure wireless companies will be at a considerable disadvantage, in our view.

- *IXCs*. The two largest interexchange carriers (IXCs) — AT&T (T) and WorldCom (WCOM) — recognize that their consumer long-distance business is being diminished by wireless, e-mails, and Bell entry into long distance. The Bell offerings are particularly problematic, as the local/long-distance bundle presents a competitive offering that AT&T and WorldCom have a difficult time emulating. In response, AT&T and WorldCom have announced plans to build, in effect, larger moats around their phone customers, with AT&T offering an unlimited long-distance plan and WorldCom offering an unlimited local and long-distance plan. What will be tested over the next 12 months is whether the larger bundles from the Bells can motivate buyers of the IXC bundles to switch.

## III. LESSONS LEARNED

**Bundles reduce churn.** All the companies we talked to indicated that the most important benefit of bundling was its reduction on levels of churn. This was true for cable companies, which face the prospect of customer churn to satellite companies, and wireless companies, which face customer churn to other wireless providers. It also appears true for the ILECs.

**Bundles improve a company's knowledge of a customer and therefore aid in cross-selling, up-selling, and managing customer migration.** Once a customer takes a service bundle, the customer relationship becomes easier to manage. The increase in data points about the customer enables the companies to better target the customer for upgrades and new services. It also provides improved intelligence about potential customer migration, whereby the customer incrementally starts to move his or her expenditures away from the service provider. Early intelligence not only helps reduce churn but also can help reduce and reverse a downward direction in customer spending before customers leave. Companies benefit from having the ability to provide loyalty opportunities, that is, providing benefits to loyal customers, by increasing the revenue-producing "life" of a customer. A recent study in the McKinsey quarterly, for example, noted that one local phone company found that "more than 90 percent of its loyalty opportunities came from reaching out to customers dropping features such as second lines and call waiting."

**Bundles carry some initial costs but eventually could reduce costs and improve margins.** There are upfront costs to offering bundles. Customer service software and activities, billing systems, and other operations must be upgraded. Companies have to resolve internal issues of marketing, internal pricing and authority for the bundle. Over time, however, these investments could help reduce costs and improve operating margins, as bundles enable companies to serve customers more efficiently and spread the costs over more revenues for more services.

**Experience to date is still limited.** Bundles are at a very early stage. The Bells are just starting to be able to bundle and, given potential competition in the local voice market, they have a new incentive to bundle aggressively to keep their customers. The cable operators' experience is also still relatively narrow. We expect that bundles will become much more robust as the companies learn more about which bundles are best for optimizing revenue and customer loyalty.

## IV. KEY ISSUES GOING FORWARD

**Back-Office/Billing/Call Centers.** One critical question is the extent to which service providers can develop back-office procedures that effectively coordinate new order inquiries, installation, service requests, billing, and customer inquiries across service platforms. The problem is exacerbated when trying to coordinate not only different divisions but also different companies (such as Cingular Wireless, which has to coordinate such procedures with both BellSouth and SBC) or legacy systems (such as those of wireless companies formed by mergers and swaps). Verizon indicates that its internal IT group has been able to handle these issues without a

Case 2:05-cv-02433-JWL   Document 220-21   Filed 06/12/2007   Page 7 of 7

Battle of the Bundles
Industry Update — June 2002                               6                        Legg Mason Wood Walker, Inc.

significant expenditure of time or money and that it anticipates that it will continue to handle these issues in-house. Cincinnati Bell reorganized its call-center operations to assure that representatives could handle questions about all the lines of service. Others say that telco system problems are likely to add costs and delays to bundling initiatives. Cable companies, which generally started with a more unified billing and back-office system, should have an advantage in this area.

**Price Regulation.** Bundling often involves integrating the prices for a regulated service (e.g., local telephony) and a non-regulated service (e.g., wireless). One Bell told us that several state public utility commissions (PUCs) had broached the subject of how regulated services were bundled with non-regulated services, but so far, no formal inquiries had been launched. A simple way for the ILECs to deal with the issue is to note on the bill the amount being attributed to the regulated service and, for accounting purposes, attribute any discount to unregulated services. This is the way Verizon currently attributes its discounts, and the company reports that it has not raised any concerns from regulators. We heard, however, from other phone companies that their experience in other states indicates that this practice could raise questions from regulators and competitors as to whether such attribution is fair in light of the ILEC's dominance in the regulated service. Consumer advocates also have raised concerns that bundling will enable the ILECs to convince consumers to buy things they don't really need along with phone service. While the issue has not been on the front burner, due to limited bundling to date, state PUC objections could create both a substantive and a timing problem for the ILECs. Cable does not face a similar regulatory issue.

**Use of Customer Data.** One of the determining factors in how bundling will play out is the extent to which the companies can use existing customer data to fine-tune their efforts to cross-sell new services and up-sell higher-value services. For ILECs, the general rule is that they can use the information they have to up-sell within the product categories in which they currently serve a customer, but they cannot use that data to sell a new line of service. That is, a phone company offering only local service can use customer data to sell related products such as voice mail or caller ID, but it could not use the data to sell wireless service. If it provides both the local and wireless service, it can use the customer data across the two lines of service to help sell advanced services in both product categories. While the Federal Communications Commission initially required an affirmative statement by a customer to use data across new service lines, a court decision remanded the rules to the FCC, which currently is reviewing the matter. While the current rules provide some impediments for sales, in the long run we believe they will not create a material hurdle to using the data to cross-sell and up-sell the full range of services. Nonetheless, the ongoing Commission proceeding is an important indicator of the future use of the data.

Cable companies are not restricted from using customer data to cross-sell or up-sell more services to existing customers.

An issue that continues to play out is the extent to which companies can use customer data to win back customers who leave them. A number of CLECs have alleged that when their new customers call a Bell to report that they wish to transfer service to a new provider, the customer