# EXHIBIT L

1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF KANSAS

 3

 4   SPRINT COMMUNICATIONS COMPANY LP,    )

 5           Plaintiff,                   )

 6       v.                               ) Case No.

 7   VONAGE HOLDINGS CORP                 ) 05-2433-JWL

 8   AND VONAGE AMERICA INC,              )

 9           Defendants.                  )

10

11        VIDEO DEPOSITION OF MR. HARLEY BALL,

12   produced, sworn, and examined on the part of the

13   Defendants in an action pending in the United States

14   District Court for the District of Kansas, in the case

15   of SPRINT COMMUNICATIONS COMPANY LP, Plaintiffs,

16   versus VONAGE HOLDINGS CORP AND VONAGE AMERICA INC,

17   Defendants, at 9:30 a.m. on Thursday, March 29, 2007,

18   at the law offices of Shook Hardy & Bacon LLP, 2555

19   Grand Boulevard, Kansas City, Missouri, before KAREN

20   S. ROGERS, Registered Professional Reporter, Certified

21   Realtime Reporter, and Notary Public in and for the

22   State of Missouri.
```

1       A.   As indicated before, Cisco was in
2   at least certain aspects of the carrier market.
3   Having Sprint as a major customer provided them
4   additional credibility in the carrier marketplace.
5       Q.   Okay.  And specifically does that
6   include in the marketplace for network equipment
7   for voice services?
8       A.   I believe that would be correct.
9       Q.   And you could turn to the next
10  page, Bates number 296.
11      A.   (The witness turns to the requested
12  page.)
13      Q.   Under long-term wins, in the fifth
14  bullet point, it says, "Sprint generates 5 billion
15  dollars per year in incremental service revenue
16  through this alliance."
17          MR. WEBB:  That's the sixth bullet point,
18  there.
19      A.   Okay.
20          MR. McPHERSON:
21      Q.   Oh, I'm sorry.  My numbers are a
22  little off.

1       A.      (The witness reviews the document.)

2       Q.      What does that mean?

3       A.      The alliance and -- was a major

4    relationship for Sprint and Cisco.

5            And the belief was, for Sprint, that

6    because of this alliance that we could have and

7    develop items that would generate significant

8    revenue for Sprint.

9            And hence, we were willing to agree to a

10   number of items.

11      Q.      What was the valuation of that 5

12   billion dollars based upon?

13      A.      I believe it was based on potential

14   projections of service revenue.

15      Q.      And were projections of service

16   revenue generated?

17      A.      (The witness does not respond.)

18      Q.      For this alliance?

19      A.      I don't know.

20      Q.      Who would be responsible for

21   developing the projections of service revenue?

22      A.      I presume it was someone in

1   finance.

2       Q.  And you don't know whether that was

3   done or not?

4       A.  Not specifically.

5       Q.  Okay.  But if the number of 5

6   billion dollars is in this agreement, is it a good

7   assumption that a projection was done?

8       MR. WEBB:  Objection.  Calls for

9   speculation.

10      A.  I don't know whether it was done.

11  It was -- clearly there was a belief that this

12  relationship could produce a substantial value to

13  Sprint in incremental service revenue.

14      MR. McPHERSON:

15      Q.  Okay.  And was the 5 billion

16  dollars that's identified in this bullet point, was

17  that taken into consideration when Sprint

18  determined what the appropriate compensation of the

19  licensing of its IP was?

20      A.  I think no question that the entire

21  relationship including our belief that we could

22  generate substantial incremental revenue associated

1  with this relationship was taken into
2  consideration.
3       Q.   And how was the 5 billion dollars
4  taken into account?
5       A.   I'm not sure I understand your
6  question.
7       Q.   Well, I think your testimony was
8  there's no doubt that the 5 billion dollar
9  projection was one thing that was taken into
10 consideration when determining the appropriateness
11 of the compensation for the intellectual property.
12      I'm asking how was it taken into account.
13      A.   I think it was just taken into
14 account as one of the factors in an overall
15 relationship with Cisco.
16      It was clearly -- you know, we clearly
17 weren't licensing any deals that ultimately would
18 be done.  We weren't licensing that IP on a
19 stand-alone basis.
20      The entire value of the relationship,
21 including the incremental service revenue, was
22 taken into consideration.

1           Q.   Okay.  Now who at Sprint would be
2    involved in determining what the appropriate
3    compensation would be for the intellectual property
4    rates?
5           A.   I think there would be a number of
6    individuals involved.
7           Q.   Okay.  Can you identify them?
8           A.   I think someone from network,
9    someone from finance.
10          Q.   Anyone from intellectual property?
11          A.   It's likely someone from legal.
12          Q.   How about from the intellectual
13   property group?
14          A.   I likely would have had input.
15          Q.   On the short-term wins back on page
16   295 in the first bullet point, Sprint understood
17   that the additional credibility that Cisco received
18   would help them sell their products to other
19   Telecom providers.  Isn't that correct?
20          A.   Gaining Sprint as a major customer
21   would have been viewed as a significant credibility
22   for Cisco --

1          A.   (The witness turns to the requested

2    page.)  Okay.

3          Q.   Now for the -- excuse me --

4    subparagraph 4.1, "Payments amount.  Cisco shall

5    pay Sprint 1 million dollars for each designated

6    Sprint component patent exclusively licensed under

7    section 2.1, 2.2, or 2.3 of this agreement."

8          Do you see that?

9          A.   Yes.

10         Q.   Does that 1 million dollars

11   represent the fair compensation that was -- that we

12   discussed earlier from the memorandum of

13   understanding?

14         A.   No.

15         Q.   Why not?

16         A.   It's my understanding that -- and

17   belief that the entire value of the relationship

18   was considered associated with the -- this

19   compensation.

20         Q.   And what was the entire value of

21   the agreement?

22         A.   It's the entire Cisco alliance.  It

```
 1    was them helping Sprint to produce new

 2    architectures -- for them to produce equipment for

 3    us that enabled us to have potentially billions of

 4    dollars in service revenue.

 5         Q.   Right.  And I understood your

 6    testimony before to be that the fair compensation

 7    took into account those considerations that you

 8    just listed. Isn't that correct?

 9         A.   That's correct.

10         Q.   Well, doesn't this 1 million

11    dollars take into account those considerations

12    you've just described for me?

13         A.   I'm not -- I'm not following you.

14    Is -- to the extent you're suggesting that on a

15    stand-alone basis that a million dollars would have

16    been considered as fair value, that would have been

17    absolutely incorrect.

18         Q.   Okay.  What does that 1 million

19    dollars represent, an unfair value?

20         A.   It would -- I believe the view was

21    only in conjunction with the entire relationship

22    with Cisco.
```