# EXHIBIT C

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| SPRINT COMMUNICATIONS COMPANY L.P., <br><br> Plaintiff, <br><br> v. <br><br> VONAGE HOLDINGS CORP., <br> VONAGE AMERICA, INC. <br><br> Defendants. | Case No. 05-2433-JWL |

**REBUTTAL EXPERT REPORT OF DR. STEPHEN B. WICKER
REGARDING APRIL 27, 2007 REPORTS OF MESSRS. HALPERN AND
KOPERDA**

On page 3-4 of his April 27 report, Mr. Halpern concedes that it is not his opinion that what he refers to as the '605 family of patents is limited to ATM technology. I agree that the '605 family of patents is not so limited. However, I disagree with Mr. Halpern's continued assertion that the '301 family patents can only cover ATM systems. Mr. Halpern does not take into account that fact that the claim language of the asserted claims contains no such limitation. Furthermore, Mr. Christie was well aware that the overwhelmingly preferred term for an ATM packet was "cell," and yet he chose to use the term "packet" in certain claims (see, e.g., claim 1 of the '294) or he chose to use the word "routing system" in other claims (see, e.g., claim 2 of the '429). If anything, this points to increased coverage, as opposed to the overly narrow construction preferred by Mr. Halpern.

In addition, the use of such words further demonstrates that Mr. Christie was in possession of an invention more broad than the ATM example embodiment provided in the '301 family specification. Mr. Koperda did not address such terminology in either his earlier or April 27 report as they pertained to written description issues in the '301 family. I would also note that while his opinion is very unclear, Mr. Koperda may be suggesting (for the first time in his April 27 report at page 43) that the '605 patent lacks written description based on the ATM disclosure. As I've noted, if he is in fact making this suggestion, such an opinion would be inconsistent with Mr. Halpern's opinion, as Mr. Halpern recognizes that the '605 family is not limited to ATM. Further, if Mr. Koperda is making such an assertion, I disagree with his conclusion for numerous reasons including the express teachings of the specification which describe system in terms of general broadband technology. In addition, it seems unusual that Mr. Koperda would develop a written description opinion at this late date as, obviously, the patents have not changed since his original report was due. Accordingly, I cannot understand Mr. Koperda's opinions with respect to the '605 family and ATM, and I reserve the right to opine further if in fact Mr. Koperda constructs a coherent opinion.

At page 4-5 of his April 27 opinion, Mr. Halpern continues to assert that the "intelligent endpoints" of the Vonage system somehow distinguish it from the Christie invention. First, I note that Mr. Halpern's contentions fail to apply to specific claim elements. Discussing the intelligence in endpoints in the abstract really serves no purpose. For example, Mr. Halpern asserts that the endpoint intelligence "provide[s] crucial information that is necessary to route messages" without explaining how this affects the fact that claimed selections are performed by a central processor. Not all intelligence needs to be contained in the processing system for a selection to be made by the processing system.

In fact and by way of example, the continuation patent specification explicitly provides for the querying of elements outside the operating system to obtain information, "crucial" or otherwise. See, e.g., '932, col. 14, ll. 42-47. Mr. Halpern's point is entirely backwards – I do not contend that intelligence in the proxies is enough. My point is that intelligence in places other than the proxies does not in any way suggest that the processing system is not making the selection. For each claim where Mr. Halpern contends that a selection is not being made by the processing system because another

device may provide some intelligence in that process, I believe the limitations are literally met as I've discussed. If not, the differences between Vonage's implementation and the specification description are insubstantial. The specifications describe querying elements outside the processing system for the processing system to make the necessary selections, which is exactly the way the Vonage system acts. The functions and results are the same. In both the specification and the Vonage network, queries are made that result in the establishment of a communication path by a processing system.

At page 5 of his report, Mr. Halpern asserts that my failure to address one or more of his comments indicates an agreement with regard to the infringement of some of the asserted patents by a NAT'd call. He seems to be confused regarding the contents of my expert reports on infringement as well as the nature of the report process. He asserts that my failure to address elements of his rebuttal somehow indicates an agreement with his statements. I am not aware of any requirement that I address each and every factitious or incorrect statement in his rebuttal, and do not agree that such a "failure" in any way constitutes an agreement with such statements. My testimony in this case is reflected in my reports, and not in any perceived tension between that report and Mr. Halpern's and Mr. Koperda's seemingly endless sequence of rebuttals.

As an example, Mr. Halpern suggests I have no opinion on the '561 patent in the NAT'd scenario. At page 26 of my Halpern Rebuttal report, I indicated that the '561 patent analysis would be largely the same as that of the '572 patent. If that was not sufficiently explicit, my analysis as to the '561 patent is the same as that of the '572 patent except that the '561 patent requires the network code to identify a network element to provide egress from the packet communication system. If this limitation of independent claims 1 and 24 is not literally met, it is certainly met under the doctrine of equivalents. While it is true that the network code used to transmit voice packets from the media gateway is that of the RTP relay, this is an insubstantial difference from using the network code identifying a Vonage user agent (or TA). The RTP relay acts as a pass-through device as the voice packets are communicated to the TA. The function of transmitting voice to the egress element (or TA) is identical. The way this is accomplished is substantially the same. Voice packets are communicated directly to the TA. There just happens to be a pass-through device in the communications path instead. Finally, the result is identical. The voice packets reach the TA and leave the packet communication system.

I note that Mr. Halpern does not identify any relevant distinctions in a NAT'd scenario as it would apply to the '932 and '064 patent. Thus, the discussion here appears to focus on the respective position both I and Mr. Halpern took in our original reports and my March 27 rebuttal report, and there is no reason to re-hash my opinions in that regard.

With respect to Mr. Halpern's '429 argument in the NAT'd scenario, I disagree with his contention that the identifier in the asserted claims requires identification sufficient to route to the TA. All that is required by the claims is that an identifier is selected and is contained in the header of voice packets exiting the interworking unit. The claims do not require that the identifier enable routing all the way to the TA. Accordingly, it is my opinion that the processing system selects an identifier that is appended to the voice

packets exiting the interworking unit or media gateway in Vonage terminology. This, of course, brings us to Mr. Halpern's second opinion on the '429, i.e., that the processing system does not perform the selection because the RTP relay sends identifying information into the processing system. As I've set forth numerous times, the '429 patent discloses querying external elements in the process of selecting an identifier. Thus, the fact that the processing system may query the RTP relay in the process of making the selection does not prevent literal infringement. I would also note that the processing system makes the decision in the first instance whether to query the RTP relay, which clearly is a processing step. If this processing is not a literal infringement it is equivalent for the reasons I've set forth numerous times.

With respect to Mr. Halpern's opinion on the '294 patent in the NAT'd scenario, I disagree with his conclusion that Vonage's processing system does not select an identifier by processing a signaling message. The processing system processes the signaling message, including a dialed number, which is received into a Vonage outbound proxy. The processing system recognizes that the call is NAT'd and then sends a query to the RTP relay to obtain necessary information to select an identifier. Mr. Halpern's distinction between "including" in claim 1 and "indicating" in claim 10 ignores the context of the respective claims. Claim 1 is directed to a voice packet and thus "includes" an identifier while claim 10 is directed to a signaling message and thus "indicates" an identifier. Mr. Halpern's analysis does not permit or require further commentary.

With respect to the '572 patent, Mr. Halpern's opinion circles the concept of a connection. To be clear, it is my opinion that a connection is a path between two components, whether logical or physical and regardless of the number of intervening switches or routers traversed. I do not agree that a connection is a 4-Tuple. Nor do I agree that a 4-Tuple is necessary to define a connection. As long as the endpoints are known a connection can be defined. I would also note that the endpoints can be separated by numerous intervening elements and still be endpoints. For example, in the '572 patent, the endpoints are the first telecommunications device and the second, but those devices have multiple intervening switches. Yet, there is only one connection between the two telecommunications devices as disclosed in the patent. In the same vein, there is only one connection between the media gateway and the TA. For all the reasons I've discussed numerous times, the processing system selects the connection between the media gateway and the TA through processing of messages and queries. That connection is the second connection called for in the claims and thus meets the limitations of the '572 claims literally.

If the fact that there is an intervening RTP relay negates literal infringement, it is still infringement under the doctrine of equivalents because the RTP relay acts as a pass-through as mentioned above. Further, the SIP invite message sent from the outbound proxy to the media gateway (through the signaling gateway) defines the second connection despite the fact that the invite includes the IP address of the RTP relay in the NAT'd scenario. The IP address of the RTP relay is all that the media gateway needs to

establish a connection with the TA because the RTP relay is just that – a relay. Thus, the SIP invite sent to the media gateway does indicate the second connection.

I note Mr. Koperda takes issue with my citation to the prosecution history of the '572 patent in which the examiner issued claims over the LaPorta '010 reference. In addition to that previously cited, in the prosecution of the '052 patent, the examiner used the same LaPorta '852 patent to reject the '052 claims. On pages 2-3 of the examiner's April 9, 2001 rejection, the '852 is clearly being used to reject all limitations. I note the '010 patent is only added to meet the limitations requiring SS7 signaling. The prosecuting attorney amended the claims and distinguished LaPorta as follows:

> page 18, lines 14-23). In La Porta, the processing system selects an ATM connection and transfers a control message to an ATM switch indicating the ATM connection. To the ATM switch, the ATM connection identifies an output VPI/VCI for routing ATM cells out of the ATM switch. The ATM connection does not identify "a network element to provide egress from a packet communication system."

It is my opinion that the examiner was aware of the relevant distinctions between LaPorta '852 and the asserted '052 claims. I note the claims issued in light of this awareness, which leads to and supports the conclusion that the '052 is not anticipated by the very same reference that the examiner carefully considered.

Date: May 2, 2007

Dr. Stephen B. Wicker