Sprint Communications Company LP v. Vonage Holdings Corp., et al         Doc. 354

Case 2:05-cv-02433-JWL  Document 354  Filed 09/05/2007  Page 1 of 37

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| SPRINT COMMUNICATIONS COMPANY L.P., | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) Case No.  05-2433-JWL |
| v. | ) |
|  | ) |
| VONAGE HOLDINGS CORP. and | ) |
| VONAGE AMERICA, INC., | ) |
|  | ) |
| Defendants. | ) |

## VONAGE AMERICA, INC. AND VONAGE HOLDINGS CORP.'S TRIAL BRIEF

Terrence J. Campbell – 18377
tcampbell@barberemerson.com
Catherine C. Theisen – 22360
ctheisen@barberemerson.com
1211 Massachusetts Street
P.O. Box 667
Lawrence, KS 66044
(785) 843-6600
(785) 843-8405 Facsimile

DUANE MORRIS LLP
Patrick D. McPherson
Barry Golob
Donald R. McPhail
1667 K Street N.W.
Washington, DC 20006-1608
202-776-7800

L. Norwood Jameson
1180 West Peachtree Street
Atlanta, GA 30309
404-253-6900

*Attorneys for Defendants/Counterclaim
Plaintiffs Vonage America, Inc. and Vonage
Holdings Corp.*

# TABLE OF CONTENTS

Page

I.  THE PROPER CONSTRUCTION OF THE REMAINING CLAIM TERMS IN
DISPUTE ..........................................................................................1

    A.  "SIGNALING MESSAGE" ('572 PATENT, CLAIM 38; '294 PATENT, CLAIM 19; '561
        PATENT, CLAIM 1) ............................................................................1

    B.  "PROCESSING THE . . . (INFORMATION, SET-UP SIGNALING, FIRST MESSAGE,
        SIGNALING MESSAGE, OR TELECOMMUNICATIONS SIGNALING MESSAGE) IN THE
        SIGNALING PROCESSOR TO SELECT" ('561, '572, '932, '064 AND '429 PATENTS) .2

    C.  "PROCESSING SYSTEM" ('429 PATENT, CLAIMS 1 AND 5; '064 PATENT, CLAIMS 1
        AND 7)................................................................................................3

    D.  "IN-BAND TELECOMMUNICATIONS SIGNALING" ('572 PATENT, CLAIM 38)..........5

    E.  "OUT-OF BAND TELECOMMUNICATIONS SIGNALING MESSAGE" ('572 PATENT,
        CLAIM 38) ............................................................................................5

    F.  "SIGNALING MESSAGE FROM A NARROWBAND COMMUNICATION SYSTEM" ('561
        PATENT, CLAIM 1) ............................................................................6

    G.  FIRST MESSAGE" ('932 PATENT, CLAIM 18) ............................................7

    H.  "GENERATING" AND "GENERATE" ('429, '572, '561, '932 AND '064 PATENTS)....8

    I.  "GENERATING A CONTROL MESSAGE INDICATING THE NETWORK CODE" ('561
        PATENT, CLAIM 1) ............................................................................8

    J.  "ROUTING/ROUTE" ('294 PATENT, CLAIM 19; '561 PATENT, CLAIM 1) ...............9

    K.  "USING THE NETWORK CODE TO ROUTE THE USER COMMUNICATION THROUGH
        THE PACKET COMMUNICATION SYSTEM TO THE NETWORK ELEMENT" ('561
        PATENT, CLAIM 1) ............................................................................9

    L.  "IDENTIFIER" ('429 PATENT, CLAIM 1; '294 PATENT, CLAIM 19)......................10

    M.  "ASYNCHRONOUS COMMUNICATION" ('429 PATENT, CLAIM 1; '064 PATENT,
        CLAIM 1) ............................................................................................10

    N.  "SET-UP SIGNALING" ('064 PATENT, CLAIM 1)......................................10

    O.  "A NETWORK CODE THAT IDENTIFIES A NETWORK ELEMENT TO PROVIDE
        EGRESS FROM THE PACKET COMMUNICATION SYSTEM" ('561 PATENT, CLAIM 1)11

**II.   SPRINT'S CLAIMS OF INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS ARE BARRED AS A MATTER OF LAW.   11**

> **P.   PROSECUTION HISTORY ESTOPPEL PRECLUDES SPRINT'S CLAIMS OF INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS. ................................11**

>> **1.   As a Matter of Law, Vonage Cannot Infringe the '301 Family Patents under the Doctrine of Equivalents............................................12**

>> **2.   Sprint is Precluded From Its Claim of Equivalents Under the '561 Patent. ......................................................................16**

>> **3.   Sprint is Precluded From Its Claim of Equivalents Under the '932 Patent. ......................................................................20**

**III.   SPRINT CANNOT MEET THE STRINGENT REQUIREMENTS OF WILLFUL INFRINGEMENT ESTABLISHED IN *IN RE SEAGATE TECHNOLOGIES*.   23**

> **A.   THERE IS NO EVIDENCE THAT VONAGE IGNORED AN OBJECTIVELY-DEFINED RISK. ....................................................................24**

> **B.   SPRINT'S EVIDENCE OF SUBJECTIVE RECKLESSNESS IS INSUFFICIENT AS A MATTER OF LAW.......................................................24**

> **C.   THE LAW OF THE CASE DOCTRINE LIKEWISE PRECLUDES A FINDING OF WILLFUL INFRINGEMENT. ............................................25**

**IV.   THE ASSERTED CLAIMS ARE INVALID BECAUSE THEY ARE NOT ENABLED. ......................................................................27**

**V.   IF THE ASSERTED CLAIMS ARE CONSTRUED TO READ ON THE ACCUSED SYSTEM, THE CLAIMS ARE INVALID FOR FAILING TO COMPLY WITH THE WRITTEN DESCRIPTION REQUIREMENT.   29**

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

AK Steel Corp. v. Sollac,
    344 F.3d 1234 (Fed. Cir. 2003)..................................................................29

ATD Corp. v. Lydall, Inc.,
    159 F.3d 534 (Fed. Cir. 1998).....................................................................26

Chimie v. PPG Indus., Inc.,
    402 F.3d 1371 (Fed. Cir. 2005)............................................................ passim

Enzo Biochem, Inc. v. Calgene, Inc.,
    188 F.3d 1362 (Fed. Cir. 1999)...................................................................29

Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,
    344 F.3d 1359 (Fed. Cir. 2003)............................................................ passim

Hakim v. Cannon Avent Group, PLC,
    479 F.3d 1313 (Fed. Cir. 2007)............................................................14, 20

In re Seagate Techs., LLC,
    Misc. No. 830, 2007 U.S. App. LEXIS 19768 (Fed. Cir. Aug. 20, 2007)
    (en banc)............................................................................23, 24, 25, 26

Invitrogen Corp. v. Clontech Labs., Inc.,
    429 F.3d 1052 (Fed. Cir. 2005)............................................................27, 28

Johnson and Johnston Assoc. Inc. v. R.E. Service Co., Inc.,
    285 F.3d 1046 (Fed. Cir. 2002) (en banc) .....................................................20

Jonsson v. Stanley Works,
    903 F.2d 812 (Fed. Cir. 1993)...............................................................12, 14

Liquid Dynamics Corp. v. Vaughan Co.,
    449 F.3d 1209 (Fed. Cir. 2006)...................................................................27

LizardTech v. Earth Resource Mapping, Inc.,
    424 F.3d 1336 (Fed. Cir. 2005)..............................................................29, 30

Mark I Marketing Corp. v. Donnelley & Sons Co.,
    66 F.3d 285 (Fed. Cir. 1995).......................................................................12

Maxwell v. J. Baker, Inc.,
    86 F.3d 1098 (Fed. Cir. 1996).....................................................................20

Novo Nordisk Pharm., Inc. v. Bio-Technology Gen. Corp.,
    424 F.3d 1347 (Fed. Cir. 2005)....................................................................29

Ormco Corp. v. Align Technology, Inc.,
    2007 U.S. App. LEXIS 20185 (Fed. Cir. August 24, 2007)..............................27, 28

Phillips v. AWH, Inc.,
    415 F.3d 1303 (Fed. Cir. 2005)..................................................................2, 8, 9

PSC Computer Products Inc. v. Foxconn International Inc.,
    355 F.3d 1353 (Fed. Cir. 2004)....................................................................20

Rohrbaugh v. Celotex Corp.,
    53 F.3d 1181 (10th Cir. 1995) ....................................................................26, 27

Sage Prods. Inc. v. Devon Indus., Inc.,
    126 F.3d 1420 (Fed. Cir. 1997)....................................................................20

Viskase Corp. v. American Nat'l Can Co.,
    261 F.3d 1316 (Fed. Cir. 2001)....................................................................26

Vitronics Corp. v. Conceptronic,
    90 F.3d 1576 (Fed. Cir. 1996)....................................................................3, 4, 10

WMS Gaming Inc. v. International Game Tech.,
    184 F.3d 1339 (Fed. Cir. 1999)....................................................................26

Zenith Lab., Inc. v. Bristol-Myers Squibb Co.,
    19 F.3d 1418 (Fed. Cir. 1994)....................................................................16

STATUTES

35 U.S.C. § 112....................................................................29

Defendants Vonage Holdings Corp. and Vonage America, Inc. (collectively, "Vonage") submit this Trial Brief to address the following issues: (1) the proper construction of the disputed claims of the Asserted Patents, (2) other dispositive issues that provide independent bases to dismiss the Plaintiff Sprint Communications Company L.P.'s ("Sprint") remaining claims as a matter of law, and (3) dispositive issues that provide bases on which the court should find the Asserted Patents invalid as a matter of law. Furthermore, Vonage reserves the right to supplement this Trial Brief to evidence admitted at trial or subsequent findings by the Court. Likewise, we reserve the right to submit directed verdict motions on these and other issues.

I.      **THE PROPER CONSTRUCTION OF THE CLAIM TERMS IN DISPUTE**

As an initial matter, Vonage hereby incorporates this Court's findings in its August 7, 2007 Memorandum and Opinion regarding the generally applicable claim construction principals. (See Doc. No. 264 at pp.19-21). Given those general principals and the additional principals discussed below, the disputed claim terms[1] should be construed as follows:

A.      **"Signaling message" ('572 Patent, claim 38; '294 Patent, claim 19; '561 Patent, claim 1)**

Based on the intrinsic evidence, "signaling message" should be construed to mean "a message used to transfer information among points and network elements to establish communication paths." The specifications of both the '301 and '605 Family Patents define the term "signaling" and thus also define the phrase "signaling message."

Nevertheless, Sprint argues that this term should be broadened to mean simply "information or commands used to set up or tear down a call." Sprint's proposed definition,

---

[1] The Court has construed "Interworking unit" and "interworking device" ('429 Patent, claim 1: '294 Patent, claim 19, '064 Patent, claim1) to be limited to mean an "ATM interworking multiplexer" based on the prosecution history as more fully developed in Vonage's Motion for Partial Summary Judgment, and has determined that Vonage cannot literally infringe these claims because it does not employ an ATM system. Vonage agrees with these constructions.

however, ignores the foregoing intrinsic evidence and the narrowing disclaimers that Sprint

made during the prosecution of the '928 patent.  (See Ex. A, '928 Patent, Jan. 15. 2002 Office

Action Response, at 8).  Sprint made a disclaimer in response to a prior art rejection by

amending the claimed phrases "receiving information ..." and "processing information ..." to

"receiving signaling . . ." and processing signaling . . ."  On the basis of this disclaimer that

unquestionably narrowed the scope of these terms, Sprint argued for patentability over the cited

prior art.  Accordingly, Sprint's proposed construction of signaling message to mean information

is contrary to the position that it took during the prosecution, i.e., that signaling is narrower than

information, and Sprint is estopped from making the opposite argument now.  See Chimie v.

PPG Indus., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the

prosecution history in construing a claim is to 'exclude any interpretation that was disclaimed

during prosecution.'"); see also Phillips v. AWH, Inc., 415 F.3d 1303, 1316-17 ("'the prosecution

history can often inform the meaning of the claim language by demonstrating how the inventor

understood the invention and whether the inventor limited the invention in the course of

prosecution, making the claim scope narrower than it would otherwise be.'").

**B.**      **"Processing the . . . (information, set-up signaling, first message, signaling message, or telecommunications signaling message) in the signaling processor to select" ('561, '572, '932, '064 and '429 Patents)**

Based on the intrinsic evidence, the claim phrase "processing .... to select" means

"processing the . . . and making a selection from more than one of the choices."  Sprint

disclaimed a broader meaning during prosecution of the '605 Patent Family to overcome prior

art.  Specifically, during prosecution of the '780 Patent, Sprint distinguished the claim language

"**processing . . . to select**" from the D'Amato prior art by pointing out that **D'Amato did not**

**actually make the selection**:

> In D'Amato, signaling director 151 does not select a connection, but selects an action for switch 130, either to (a) proceed, (b) wait, or (c) deny. . . . None of these responses is a connection.  If response (a) is given, switch 130 must process the [message] to select a connection.  **Because it selects connections, the signaling processor of claim 139 is different than signaling director 151 of D'Amato**.  The signaling processor of claim 139 is advantageous in that it can avoid the need for this level of processing complexity in the switch.

(See '605 Application, Office Action Response, April 16, 1997, Ex. B at 21).

Sprint distinguished the claim language from the prior art processor that merely participated in a selection on the basis that the claimed processor actually made the selection.  Thus, Sprint disclaimed the very meaning it proposes now.  The prosecution history disclaimer thus limits the meaning of "processing . . . to select" for the purposes of both claim construction and the doctrine of equivalents.  See Festo, 234 F.3d at 569; see also Vitronics, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Furthermore, the disclaimer is consistent with multiple representations made to the PTO that the claimed processor's selection relieved the complexity of the switches on the communications path.  "The signaling processor of claim 139 is advantageous in that it can avoid the need for this level of processing complexity in the switch."  Id.  Similar assertions were made in corresponding prosecution.  For example, in prosecuting the '572 Patent, Sprint stated: "Applicant has repeatedly pointed out the problems with integrating call control into the complex switch shown on FIG 7." (See Ex. C, Office Action Response, June 26, 2000, at 4).

Thus, the prosecution history makes clear, through disclaimer and substance, that "processing the . . .to select" means  "processing the . . . and making a selection from more than one of the choices."

### C.    "processing system" ('429 patent, claims 1 and 5; '064 patent, claims 1 and 7)

Based on the intrinsic record, "processing system" should be construed to mean "any

processing system platform that can receive and process signaling to select virtual connections, and then generate and transmit signaling to identify the selections". The scope of the Terms is clear from '301 Family Patent specification:

> Signaling processing system 160 is any processing platform that can receive and process signaling to select virtual connections, and then generate and transmit signaling to identify the selections.

('294 Patent, Doc. No.1, Ex G, col. 4:24-27). Any other definition contradicts the fundamental principal that a patentee can be his/her own lexicographer. See Vitronics, 90 F.3d at 1582 ("[A] patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history. . . . [I]t is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication").

Furthermore, Sprint relied on the fact that the "processing system" is defined as a system that receives and processes signaling in order to overcome the Skoog prior art patent during the prosecution of the '928 Patent (a child in the '301 Family Patents). (See Ex. A). Accordingly, Sprint's proposed construction of proper and ordinary meaning that avoids its own definition and disclaimer is contrary to the intrinsic evidence and should not be adopted. Vintronics, 90 F.3d at 1582; Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1384 (Fed. Cir. 2005) ("The purpose of consulting the prosecution history in construing a claim is to exclude any interpretation that was disclaimed during prosecution.").

### D. "In-band telecommunications signaling" ('572 Patent, claim 38)

Based on the '572 Patent claims and specification, "in-band telecommunications signaling" must be construed to mean "signaling transmitted on the actual communications path." The specification expressly defines "in-band telecommunications signaling" as:

> As known in the art, "in-band signaling is typically used in many user to network connections, such as the local loop. This is because only one connection or link is typically provided to the user premises and thus, the signaling must be placed on the actual communications path."

(See '572 Patent, Doc. No. 1, Ex. A col. 7:50-54; see also Id., col. 8:56-59 and col. 7:54-57).

### E. "out-of band telecommunications signaling message" ('572 Patent, claim 38)

Based on the '572 Patent claims and specification, "out-of-band telecommunications signaling message" should be construed to mean "signaling message that is not transmitted on the actual communications path." The specification states that "out-of-band telecommunications signaling" is signaling that is not on the communications path: "The initial network switch typically removes the signaling from the communications path and transfers it to an out-of-band *signaling system*." (See '572 Patent, Doc. No. 1, Ex. A at col. 7:54-57; see also col. 8:56-59 ("If in-band signaling is employed on connections 222 and 232, network 210 would separate at least a portion of the signaling out-of-band and transmit it to CCP 250 over link 214.")).

The extrinsic evidence reinforces this construction. Sprint's Glossary defines out-of-band signaling as: "[a] technique that uses a separate data link that is not in the voice circuit to transmit call setup and ANI information from carrier to carrier, or from carrier to customer." (See Ex D). Thus, to the extent that Sprint relies on other extrinsic evidence to argue a definition other than the definition provided in the '572 Patent specification, that evidence can only create an ambiguity as to a definition based on extrinsic evidence, and such evidence should be disregarding in favor of the intrinsic evidence.

F.    **"Signaling message from a narrowband communication system" ('561 Patent, claim 1)**

Based on the intrinsic evidence, "a signaling message from a narrowband communication system" must be limited to mean "a signaling message (as defined above) received in the format sent from a narrowband communication system." In the '561 Patent specification, the inventor laments the lack of interchangeability between the signaling of broadband and narrowband switches and recognizes the need for the claimed processor to receive narrowband signaling from narrowband switches so that the processor can generate new broadband signaling messages to the broadband switches: "It would be advantageous if narrowband and broadband networks could interwork through an intelligent interface to establish a communications path between points." (See Doc. No. 1, Ex B '561 Patent, col. 3:18). This problem identified by Mr. Christie -- the need for an intelligent interface -- is solved in the '561 Patent by the communication control processor CCP, which is the crux of Mr. Christie's alleged invention.

During prosecution of the '561 Patent and it related patents, Sprint, in order to obtain allowance of the asserted claims, repeatedly argued to the Patent Office that "signaling message formatted for a narrowband system" and "signaling message from a narrowband system" were the same: Claims 1 and 21 require 'receiving signaling formatted for a narrowband system into a processing system that is external to any communication switches' . . . . La Porta '852 does not teach the processing of signaling from narrowband systems. (See Ex. E, '052 Patent, Jan. 29, 2001 Response to Office Action, pp. 3-4, emphasis added). Sprint also admitted that:

> Claim 1 requires receiving a signaling message for the user communication from a narrowband communication system into a processing system. This functionality was readily available at the time of the invention as it existed in switches, signal transfer points, and service control points. In SS7 jargon, the functionality is called a signaling point. It appears clear to the Applicant that those skilled in the art could make and use a processing system with this limitation without undo experimentation.

6

(See Ex. F, '561 Patent, Aug. 7, 2002 Response to Office Action, p. 2; see also, Exs. G and H, '282 Patent, April 10, 2000 and Oct. 26, 2000 Office Action Responses, pp. 4 and 16, respectively).  Based on these prosecution history disclaimers, Sprint is barred from arguing that the terms should be construed to encompass the disclaimed material.  Chimie, 402 F.3d at 1384.

### G.    "First message" ('932 Patent, claim 18)

Based on the intrinsic evidence, the phrase "first message" must be limited to "a narrowband signaling message."  The '932 Patent specification recognizes that the first signal is a narrowband signaling message:

> Thus, preferably the CCP processes signaling before it is applied or processed by the switch such as to select connections or generate queries. Preferably, no or minimal changes are made to the signaling prior to the signaling being received by the CCP **so that the CCP receives the signaling in the same format as a switch would receive the signaling**. The CCP may also process the signaling in that format. The switches make their selections based on the CCP selections, thus the switch selections clearly occur after the CCP has processed the signaling. As such, the switch may route signaling to the CCP, but the switch does not apply the signaling.

(See Doc. No. 1, Ex. D,'932 Patent, col. 7:64 and col. 8:8; see also id., col. 7:58-60 and col. 3:37-40 ("The method includes receiving a first signal into a processor which is located externally to the switches in a network comprised of network elements.").  Moreover, the '932 Patent specification also indicates that the first signal is in the form originally received into the network:

> The processor selects a network characteristic in response to the first signal. The processor then generates a second signal reflecting the network characteristic and transmits the second signal to at least one network element. This transmission occurs before that network element has applied the first signal.  Id.,col.3:40-45.

In addition, during prosecution of the '932 patent and it related patents, Sprint made arguments regarding the signaling received by the processor to overcome a prior art rejection:

> In the claim, the signaling processor sends a signaling message to a
> switch that did not generate a query. In contrast, SCPs only
> respond to the switch that sent the query. This claimed distinction
> is made possible because the claimed signal processor receives the
> same signaling messages typically received by switches. It can
> then process this signaling to generate new signaling messages for
> transmission to any switch needed to establish the communications
> path.

(See Ex.I '605 application, Dec. 12, 1995 Office Action Response, p. 16 (discussing Claim

121)).  Thus, the first message is the signaling message accompanying a telephone call that is

sent directly to the processing system, *i.e.*, SS-7 or Q.93 1, and Sprint is not entitled to any

equivalents as a matter of law.  Chimie, 402 F.3d at 1384; Phillips, 415 F.3d at 1316-17.

### H. "generating" and "generate" ('429, '572, '561, '932 and '064 Patents)

Based on various claims and the specification of both the '605 and '301 Patent Families,

"generating" and/or "generate" means "create [or creating] for the first time."  These

specifications use "generate" in the context of creating new signaling: "the signaling processor

*generates new signaling*." (See, e.g., '294 Patent, col. 2:17-22 ("The method comprises receiving

the signaling for the call into the signaling processor, processing the signaling to select the

virtual connection, generating new signaling to identify the particular connection and the

selected virtual connection, and then transmitting the new signaling to the ATM interworking

multiplexer.); see also '561 Patent, col. #4:18-20 ("The signaling processor is operational to

process signaling and *to generate new signaling* information based on the processing.").  Sprint's

proposed construction of "generate", which excludes a temporal quality as it relates to the

creation of a signaling message, is not supported by the intrinsic evidence and should be rejected

in favor of Vonage's proposed construction.

### I. "generating a control message indicating the network code" ('561 Patent, claim 1)

Based on the constructions of these terms individually set forth in this brief, this phrase should be construed to mean "creating for the first time a new control message specifying the logical address of the egress network element."

**J.      "Routing/Route" ('294 Patent, claim 19; '561 Patent, claim 1)**

Based on the claims and specification of the '294 Patent and the '561 Patent, "routing" and "route" should be construed to mean "deliver[ing] to the destination through a communication system."  In the '294 Patent specification, the principle discussion of "routing" relates to signaling, and uses "route" in the context of delivering the signaling message to its final destination: "CCM 250 would be identified by its own signaling point code. STP 260 would route signaling messages addressed to this point code to CCM 250." (See '294 Patent, col. 6:23-26; see also, id., col. 9:50-59).  Likewise, in the context of a call, the '294 Patent specification again use "route" in terms of delivering voice to a destination, *i.e.*, the users. (Id., col. 10:5-7). The '561 Patent specification and claims do not deviate from this definition. (See, e.g., '932 Patent, col. 11:38-39 and col. 11:58-60).  Thus, in the context of both signaling or voice routing, the '294 Patent and '561 Patent specifications clearly use "routing" to mean "delivering to the destination through a communications system" and Sprint's attempt to broaden this construction is not supported by the intrinsic evidence.

**K.      "Using the network code to route the user communication through the packet communication system to the network element" ('561 Patent, claim 1)**

Based on the constructions of these terms individually set forth in this brief, "using the network code to route the user communication through the packet communication system to the network element" means: "using the logical address identifying the network element to deliver the user communication through the packet communication system to the egress network element."

**L.     "Identifier" ('429 Patent, claim 1; '294 Patent, claim 19)**

The Court has construed "identifier" to mean "data for routing user information in a packet network."  (Doc. No. 264, p. 13).  The Court reasoned that the doctrine of claim differentiation broadened this term beyond a VPI/VCI identifier specifically and solely disclosed by Sprint in its explanation of the claimed and disclosed ATM inventions.  However, the Court has mistakenly relied on claim differentiation, without reference to Vonage's ability to overcome the presumption attached to this doctrine.  Vitronics Corp. v. Conceptronic, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

In this case, there can be no doubt that the '301 Family Patents specification is limited to ATM, as the Court has so found in holding that the interworking device is limited to an ATM interworking multiplexer.  Because the specification is so limited, the doctrine of claim differentiation cannot be used to broaden identifier.  Moreover, Vonage has unquestionably overcome this presumption, and the Court has implicitly so found by limiting the specification to ATM.  Because the only "identifier" that can be used with an ATM interworking multiplexer is a VPI/VCI identifier, this term must be so limited.

**M.     "Asynchronous communication" ('429 patent, claim 1; '064 Patent, claim 1)**

For the same reasons as discussed above relating to "identifier," the only asynchronous communication described in the specification that can be used with an ATM multiplexer is an ATM cell, that is, an "ATM communication".

**N.     "set-up signaling" ('064 Patent, claim 1)**

Based on the '064 Patent claims and specification, "set-up signaling" should be construed to mean "a narrowband signaling message."  The '301 Family specification describes "set-up signaling" not as a term of art, but rather it is used by Sprint to describe the initiation of a call using narrowband signaling: "The initial address message (IAM) [narrowband signaling

message] initiates the call and contains call set-up information, such as the dialed number. IAM are transferred in the calling direction to set up the call." (See '294 Patent, col. 17:43-46.  see also col. 2:28-30 ("The signaling for the call could be a call set-up message, such as Signaling System #7 (SS7) initial address message (IAM).").

### O.    "a network code that identifies a network element to provide egress from the packet communication system" ('561 Patent, claim 1)

Based on the '561 Patent claims and the specification, "a network code that identifies a network element to provide egress from the packet communication system" means "a logical address identifying a network element that provides an exit from a packet communication system."  The term "network code" is explicitly defined as: "Network codes are the logical address of a network element." (See '561 Patent, col. 12, lines 47-53).

In the doctrine of equivalents discussion (*supra*), Vonage details the claim amendments made during prosecution regarding this "egress" claim language.  The amendments operate as a disclaimer for the purposes of claim construction for the same reasons they bar the doctrine of equivalents.  Thus, "a network code that identifies a network element to provide egress from the packet communication system" means "a logical address identifying a network element that provides an exit from a packet communication system."

## II.    SPRINT'S CLAIMS OF INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS ARE BARRED AS A MATTER OF LAW.

### P.    Prosecution History Estoppel Precludes Sprint's Claims of Infringement under the Doctrine of Equivalents.

Sprint is estopped from now arguing that the doctrine of equivalents applies to broaden the claim terms that it narrowed during prosecution in response to prior art rejections.  As the Federal Circuit reaffirmed in Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 344 F.3d 1359 (Fed. Cir. 2003) ("Festo III"), prosecution history estoppel requires a two-step inquiry.  The

Court must first determine whether the amendment narrowed the literal scope of the claim and was made for a reason related to patentability.  Id. at 1366.  Second, the Court must determine whether the patentee surrendered the particularly alleged equivalent in question.  Id.  Prosecution history estoppel serves as a complete bar to equivalents for a given limitation, unless the patentee is able to rebut the "presumption of total surrender by demonstrating that it did not surrender the particular equivalent in question according to the criteria discussed below."  Id. at 1367. However, if the patentee fails to rebut the presumption, "prosecution history estoppel bars the patentee from relying on the doctrine of equivalents for the accused element."  Id.

> **1.      As a Matter of Law, Vonage Cannot Infringe the '301 Family Patents under the Doctrine of Equivalents.**

In its summary judgment order, this Court dismissed Sprint's claims for literal infringement of the '301 Family Patents.  (See Mem. and Order dated August 7, 2007, Doc. No. 264, at 2).  Accordingly, Sprint is left to argue infringement solely based on the doctrine of equivalents.  Sprint's actions during the prosecution of the Asserted Patents, however, bar Sprint from relying on equivalents to capture non-ATM technology.

> **a.      In Sprint's Prosecution of the '605 Application and the '301 Application, Sprint Narrowed the '301 Patent's Claims to Include only ATM Technology.**

When analyzing prosecution history estoppel, the prosecution history as a whole, including the prosecution history of parent applications, must be examined.  Jonsson v. Stanley Works, 903 F.2d 812, 818 (Fed. Cir. 1993).  Based on a related principle, an estoppel arises when an applicant files a continuation-in-part application with narrower claims than the parent application, rather than responding to a rejection of the parent application by the Patent Office. Mark I Marketing Corp. v. Donnelley & Sons Co., 66 F.3d 285, 292 (Fed. Cir. 1995).

The forgoing principals have direct application to the '301 Family Patents.  On July 7, 1995, the Patent Office issued a final rejection of the '605 Application, *i.e.*, the root of the '301 Family Patent and '605 Family Patent trees.  (See Final Rejection, Doc. No. 297, Ex. A).  In response, Sprint elected to abandon the '605 Application and file a series of continuation and continuation-in-part applications.  Among the continuation-in-part applications was Application No. 08/525,897 that led to the '301 Patent (the "'301 Application").

Sprint's claims in the '301 Application were narrower than the rejected claims in the '605 Application, as Sprint included in these claims elements that are unique to ATM communications systems.  Among other things, Sprint narrowed the claim limitation "network elements" in the rejected '605 Application to "ATM interworking multiplexer" used in the '301 Application.  Likewise, Sprint narrowed the claim term "connections" to *virtual* connections."  (See Application for '301 Patent, Sept. 8, 1995, Doc. No. 297, Ex. B, pp. 38-51; and Response to Office Action, May 15, 1995, Doc. No. 297, Ex. C, pp. 3-19).

The first claim limitation -- network elements -- was narrowed to "ATM interworking multiplexer" to get around the Gopal references on which the Patent Office rejected the '605 Application:

> The claims to the instant invention read on Gopal wherein there is disclosed a telecommunications network architecture that is comprised of switches 11-17, corresponding to the instant ***network elements*** . . .

(See Doc. 297 Ex. A, at 4 (emphasis added)).  Then, after an initial rejection of the '301 Application despite Sprint's efforts to circumvent the Gopal reference, Sprint made a second narrowing amendment by limiting "connections" to "virtual connections" to avoid the Hiller reference on which the '301 Application was initially rejected:

> In the invention, the ATM multiplexer uses the <u>virtual connection</u> <u>identified in the signaling</u> in order to interwork a call with the

13

proper virtual connection.  For example, the signaling processor may select and identify the particular VPI/VCI that the ATM multiplexer should use on a given call.  As a result, the ATM multiplexer would place this VPI/VCI in the headers of the ATM cells for that call.

\* \* \*

In Hiller, the ATM multiplexer does <u>not</u> use signaling that <u>identifies a selected</u> <u>virtual connection</u>.

\* \* \*

Claims 1-15 and 17-66, all require the limitation that the ATM multiplexer use signaling that identifies the virtual connection to interwork a call into the selected virtual network.

(<u>See</u> Doc. 297 Ex. D, at 8, (emphasis in original)).  Sprint unquestionably narrowed "network elements" that used "connections" to an "ATM interworking multiplexer" that used "virtual connections."  Thus, there is an unrebuttable presumption that Sprint surrendered all subject between "network elements" using "connections" to "ATM interworking multiplexer" using "virtual connections."  <u>Festo</u> III, 344 F.3d at 1365; <u>see also</u> <u>Jonsson</u>, 903 F.2d at 818.

### b.     The Prosecution History Estoppel Applies to All Continuation Patents of the '301 Family Patents.

As a result of an estoppel created in a parent application, a patentee may not recapture claim scope in a continuation application that was surrendered by the patentee in prosecuting a parent application unless the patentee clearly rescinds the disclaimer made during the prosecution of the parent.  <u>Hakim v. Cannon Avent Group, PLC</u>, 479 F.3d 1313, 1317-18 (Fed. Cir. 2007).  Rescission of a prosecution history disclaimer in a later filed application requires that Sprint inform the examiner that the previous disclaimer was being rescinded and to identify the prior art and the arguments made to overcome the art.  <u>Id</u>. at 1318.

As discussed above, Sprint surrendered claim scope by submitting narrowed claims in the '301 Application a continuation-in-part of the originally filed '605 Application, solely in order to

14

circumvent prior art. In order to avoid the estoppel that arose out of the surrender of claim scope, Sprint must have informed the examiner during the prosecution of each relevant child application (i.e., the '429 Patent, the '294 Patent and the '064 Patent) that the previous disclaimer of the '301 Patent was being rescinded. Sprint also should have identified the prior art based on which the examiner rejected the '301 Patent and provided new arguments to overcome the art. Because Sprint did not do so, Sprint failed to rescind the surrender of claim scope made during prosecution of the parent '301 Patent and it is barred from attempting to recapture the surrendered scope under the doctrine of equivalents with respect to all asserted claims in the '301 Family Patents. Elkay Mfg., 192 F.3d at 980.

> ### c.    Sprint's Prosecution of the '605 Family Patents Separately Bars It from Claiming the '301 Family Patents Cover Non-ATM Technology.

Furthermore, during the prosecution of the '605 Family Patents, Sprint repeatedly argued that a system using ATM *connections* was fundamentally different than a system that uses network codes to identify *network element*s:

> In the La Porta references, the processing system **selects an ATM connection** and transfers a control message to an ATM switch indicating the ATM connection. **To the ATM switch, the ATM connection identifies an output VPI/VCI for routing ATM cells out of the ATM switch. The ATM connection does not identify "a network element** to provide egress from a packet communication system."

(See Prosecution History of '052 Patent, Office Action Response dated Sept. 6, 2001, Doc. No. 297 Ex. E, at 6 (emphasis added); Prosecution History of U.S. Patent No. 6,366,586, Office Action Response dated May 30, 2001 (Doc. No. 297 Ex. F); Prosecution History of U.S. Patent No. 6,643,282, Office Action Response dated May 17, 2001 (Doc. No. 297 Ex. G)).

Sprint is attempting to take the opposite position in this litigation. Sprint now argues that a network element (*i.e.*, an ATM interworking multiplexer) that uses an ATM connection is

equivalent to a network device (*i.e.*, a SIP Gateway) that uses a network code.  Sprint is estopped

from making this argument in support of its doctrine of equivalents theory because it is directly

contrary to the argument Sprint made to the Patent Office in order to obtain allowance of the

'605 Family Patents.  See, e.g., Zenith Lab., Inc. v. Bristol-Myers Squibb Co., 19 F.3d 1418,

1424 (Fed. Cir. 1994) (prosecution history estoppel precludes a patentee from obtaining in an

infringement suit protection for subject matter which it relinquished during prosecution in order

to obtain allowance of the claims); Elkay Mfg., 192 F.3d at 980.  ("When multiple patents derive

from the same initial application, the prosecution history regarding a claim limitation in any

patent that has issued applies with equal force to subsequently issued patents that contain the

same claim limitation.").  Thus, Sprint's claim fails as a matter of law because the media

gateway in the accused Vonage VoIP system cannot be found to be equivalent to the ATM

interworking multiplexer.

### 2.   Sprint is Precluded From Its Claim of Equivalents Under the '561 Patent.

By virtue of narrowing amendments Sprint made during the prosecution of the related

'052 Patent, prosecution history estoppel precludes Sprint from introducing any arguments or

testimony concerning infringement under the doctrine of equivalents of the '561 Patent, at least

with respect to the limitation *to select a network code that identifies a network element to*

*provide egress for the user communication from the packet communication system* a phrase that

is not literally met by any accused product.

During prosecution of the '052 Patent, Sprint amended the "selecting a network code"

limitation in response to a final rejection by the Patent Office based on prior art.  Sprint amended

the scope of its claims and argued for patentability based on the amendment.

16

Specifically, claim 1 of the '052 Patent, which was rejected based on prior art, read, in relevant part, as follows:

> 1.    A method for controlling communications, the method comprising:
> . . . .
> receiving signaling formatted for a narrowband system into a processing system that is external to any communication switches;
> **selecting a code in the processing system based on the signaling . . .**

(See Response to Office Action, Jan. 31, 2001, (Doc. No. 293 Ex. A) (emphasis added)).

In response to the final rejection of all claims by the Patent Office based on the prior art, Sprint canceled rejected claims 1-63 and replaced the canceled claims with claims 64-87. New claim 64 reads, in relevant part, as follows:

> 64.    A method of transferring a user communication to a packet communication system, the method comprising:
> receiving the user communication into a device;
> receiving signaling formatted for a narrowband system into a processing system;
> **in the processing system, processing the signaling to select a network code that identifies a network element to provide egress for the user communication from the packet communication system ...**

(See Response to Office Action, Sept. 10, 2001, Doc. No. 293 Ex. B, 2 (emphasis added)).

As shown in the highlighted portions of canceled claim 1 and new claim 64, Sprint narrowed the scope of the patent with respect to the "selecting a network element" limitation. In the Remarks accompanying this amendment, Sprint affirmatively asserted that the amendment to the claims was intended to distinguish the prior art cited by the Examiner:

> Claims 1-63 are pending and stand rejected. Claims 1-63 have been replaced by new claims 64-87.
> . . . .
> **In new claim 64, a processing system receives and processes narrowband signaling to select a network code that identifies a network element to provide egress from a packet**

17

> **communication system for a user communication.** (See the
> Application, page 18, lines 14-23)  In La Porta, the processing
> system selects an ATM connection and transfers a control message
> to an ATM switch indicating the ATM connection.  To the ATM
> switch, the ATM connection identifies an output VPI/VCI for
> routing ATM cells out of the ATM switch.  **The ATM switch does
> not identify "a network element to provide egress from a
> packet communications system."**

('561 Patent, Doc. No. 1, Ex. B, 6 (emphasis added)).  In response to Sprint's amendment to the

claims and the remarks, the examiner allowed the claims.

Sprint cannot overcome the presumption that it surrendered all subject matter between the

step "selecting a code in the processing system based on the signaling" in canceled claim 1 and

the step "in the processing system, processing the signaling to select a network code that

identifies a network element to provide egress for the user communication from the packet

communication system" in claim 64.  Festo III, 344 F.3d at 1365.

Sprint's narrowing amendments surrendered all equivalents to the *selecting a network

code* limitation in the '052 patent, and thus the sister '561 Patent, which shares an identical

specification.  The original scope of Claim 1 in the '052 Patent was based on the limitation

*selecting a code in the processing system based on the signaling* including the selection of a code

representing a network element or a connection.  The specification of the '052 and '561 Patents

describes that the processor (CCP) could select any, all or none of the network elements and

connections:

> **The CCP might select all of the network elements, a portion of
> the network elements, or none of the network elements** leaving
> the switches to select the remainder.  The CCP might select all of
> the connections, a portion of the connections, or none of the
> connections, again leaving the elements to select the remainder.
> The CCP may select combinations of the above options, but the
> CCP will always select at least one network characteristic.

(Doc. No. 1, Compl. Ex. C, at 7:20-29 (emphasis supplied)).

As amended, the new scope of Claim 1 in the '052 Patent is narrowed to selecting the network code of the network element that provides egress from the packet communication system. Sprint thus clearly surrendered the step it now accuses Vonage of infringing: the selection of a network code for any network element other than one which provides egress from the packet communication system. Sprint overcame or avoided a prior art rejection by adding the additional requirement that the network code identified a network element, and that the network element provided egress from the packet communication system. Thus, Sprint had originally contemplated broader claims (selecting a code which could represent any network element or connection), but narrowed the claims' scope to secure issuance of the patent.

Sprint asserts that Vonage's VoIP system infringes independent claim 1 of the '561 Patent, which provides, in relevant part, as follows:

> 1.    A method of operating a processing system to control a packet communication system for a user communication, the method comprising:
> receiving a signaling message for the user communication from a narrowband communication system into the processing system;
> **processing the signaling message to select a network code that identifies a network element to provide egress from the packet communication system for the user communication ...**

('561 Patent, Doc. No. 1, Compl. Ex. B, Claim 1 (emphasis added)). Sprint now accuses Vonage of infringement based on the selection of the network code of the RTP Relay as being an equivalent to the recited limitation. (Doc. No. 264, at 54). The RTP Relay, however, is not a network element that provides egress form the packet communication system. Id. at 53. To the contrary, selecting the network code of the RTP Relay is the very step that Sprint surrendered with its narrowing amendments.

19

Sprint may not recapture claim scope in a continuation application that was surrendered by the patentee in prosecuting a parent application unless the patentee clearly rescinds the disclaimer made during the prosecution of the parent.  <u>Hakim v. Cannon Avent Group, PLC</u>, 479 F.3d 1313, 1317-18 (Fed. Cir. 2007).  During prosecution of the '561 Patent, Sprint did not inform the examiner that any previous disclaimer was rescinded and that the prior art that was avoided by the amendment and argument may need to be revisited.  Thus, based on the prosecution of the application for the '052 Patent, Sprint is barred as a matter of law from recapturing surrendered claim scope of the *selecting a network element* limitation in the '561 Patent under the doctrine of equivalents to cover the selection of the network code of an RTP relay.

### 3.    Sprint is Precluded From Its Claim of Equivalents Under the '932 Patent.

Sprint's Amendments to the '932 Patent bars Sprint from asserting that the claimed step of *selecting a narrowband switch* can be read on the Vonage system which selects a DS0 connection.  Subject matter that is disclosed but not claimed is dedicated to the public.  <u>Johnson and Johnston Assoc. Inc. v. R.E. Service Co., Inc.</u>, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (*en banc*).  This "disclosure-dedication" rule limits the application of the doctrine of equivalents to prohibit the encompassing of disclosed but unclaimed subject matter.  <u>See, e.g., PSC Computer Products Inc. v. Foxconn International Inc.</u>, 355 F.3d 1353, 1356 (Fed. Cir. 2004).

When Sprint disclosed but declined to claim this subject matter, Sprint dedicated this unclaimed subject matter to the public.  <u>Maxwell v. J. Baker, Inc.</u>, 86 F.3d 1098, 1106-08 (Fed. Cir. 1996).  Application of the doctrine of equivalents to recapture subject matter deliberately left unclaimed would "conflict with the primacy of the claims in defining the scope of the patentee's exclusive right."  <u>Sage Prods. Inc. v. Devon Indus., Inc.</u>, 126 F.3d 1420, 1424 (Fed. Cir. 1997).

Claim 18 of the '932 Patent recites:

> A communication system . . . the communication system comprising:
>
>> a processing system external to narrowband switches and configured to receive and process the first message **to select one of the narrowband switches**;

(Doc. No. 1, Ex. D (Claim 18) (emphasis added)).

In the '932 Patent specification, Sprint defines an element and a connection, and makes very clear they are not the same:

> Typically, telecommunications systems are comprised of network elements and connections. **A network element is a telecommunications device such as a switch**, server, service control point, service data point, enhanced platform, intelligent peripheral, service node, adjunct processor, network element of a different network, enhanced system or other network related device, server, center or system.
>
> **A connection is the media between two network elements** that allows the transfer of information. A few examples of connections are: digital T1 lines, OC-3 optical fibers, packet connections, dedicated access lines, microwave transmission, and cellular radio. As those skilled in the art are aware, connections can be described in a range from general to specific. All of the media between two switches is a general description and might correspond to a virtual path in an ATM system or a trunk groups in a T1 system. **An individual circuit between two elements is more specific and might correspond to a virtual channel in an ATM system or a DS0 circuit in a T1 system**.

('932 Patent, Doc. No. 1,. Ex. D. col. 4, l. 57 – col. 5, l. 8).  Based on the plain language of the specification, a narrowband switch is an *element*, and a DS0 connection is a *connection*, and they are different.

In the '932 Patent specification Sprint discloses that the processor may select a network element, a connection or any combination thereof:

> The CCP might select all of the network elements, a portion of the network elements, or none of the network elements leaving the

> switches to select the remainder.  The CCP might select all of the
> connections, a portion of the connections, or none of the
> connections, again leaving the elements to select the remainder.
> The CCP may select combinations of the above options, but the
> CCP will always select at least one network characteristic.

(Doc. No. 1, Ex. D., at col. 6, lines 23-29).

> In one embodiment, CCP 120 selects the network elements and the
> connections that comprise the communications path. . . . In
> another embodiment, CCP 120 may select only the network
> elements and not the connections.

(Id. at 62-63).

The specification also discloses that in some specific situations, the selection of a

network element "*effectively*" selects a connection:

> There are situations in which the selection of a network element
> and the selection of a connection **signify** the same thing.  ...This is
> because the connection inevitably connects to the element.  The
> selection of a connection may **effectively** select a network element,
> and the selection of a network element may **effectively** select a
> connection (or a group of specific connections) to that network
> element.

(Id. at Col. 7 l. 10-19).

The test for literal infringement requires every limitation to read on the accused device

exactly.  Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co., 425 F.3d 1366, 1373

(Fed. Cir. 2005) ("Literal infringement of a claim exists when every limitation recited in the

claim is found in the accused device, i.e., when the properly construed claim reads on the

accused device **exactly**.")  In contrast, the use of the terms "**signify**" and "**effectively**" in the

specification makes clear that selecting a network element is not the same thing as selecting a

connection, but may ultimately lead to the same result, *i.e.*, the same communication path.  For

example, the selection of a narrowband switch may effectively result in the selection of many

DSO's connections associated with the switch.  However, the selection of the DSO may be left to the switch (and not the processing system external to the switch).

Not surprisingly, then, Sprint filed claims directed to where the processor selects a network element, as in Claims 1 and 18 of the '932 Patent, and ***also*** filed claims directed to selecting a connection, as in Claim 16 of the related '561 Patent:

> 16.    The method of Claim 1 further comprising processing the signaling message to select a DS0 connection to provide egress from the packet communication system**.**

('561 Patent, Doc. No. 1, Ex. B).

The fact that Sprint claimed *processing to select a DS0 connection* in the '561 Patent, with an identical specification to the '932 Patent, is conclusive evidence that one of skill in the art would understand that the '932 Patent clearly describes, ***but does not claim***, the selection of a DS0 connection.  Because the '932 specification clearly describes to one of skill in the art that the processor can select a DS0 connection, but Sprint chose not to claim that feature, Sprint is estopped from asserting that "selecting a narrowband switch" is equivalent to the selection of a DS0 connection.

## III.    SPRINT CANNOT MEET THE STRINGENT REQUIREMENTS OF WILLFUL INFRINGEMENT ESTABLISHED IN *IN RE SEAGATE TECHNOLOGIES.*

Sprint's claims of willful infringement should be denied as a matter of law because there is insufficient evidence to meet the stringent two-pronged test for willfulness announced in In re Seagate Techs., LLC, Misc. No. 830, 2007 U.S. App. LEXIS 19768 (Fed. Cir. Aug. 20, 2007) (en banc) ("Seagate").  In Seagate, the Federal Circuit established a significantly higher threshold for proving willful infringement by creating a new test embodying a recklessness standard, rather than the previously-used negligence standard.  Id. at *21-22.  According to the Seagate willfulness test, "a patentee must show by clear and convincing evidence that the

infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." Id. at *22-23.  In other words, the patentee must offer evidence of an "objectively-defined risk" that the accused product infringes the asserted patent, *i.e.,* the infringer's state of mind is not relevant.  Id. at *23.  Secondly, if the patentee satisfies the first prong, the evidence must also show that the accused infringer knew of this objectively-defined risk or that risk was so obvious that it should have been known to the alleged infringer.  Id.

### A.     There Is No Evidence that Vonage Ignored an Objectively-Defined Risk.

The record in this case is devoid of any evidence that Vonage recklessly infringed the Patents-in-Suit, no less clear and convincing evidence sufficient to satisfy the first prong of the Seagate willfulness test.  Sprint's willfulness claim has focused on the absence of an opinion of counsel on which Vonage could have relied in response to Sprint's pre-litigation licensing letters.  However, the absence of an opinion of counsel is not relevant to the first prong of the Seagate willfulness test.  As the Federal Circuit definitively held in Seagate, *there is no affirmative duty of care* on the part of an accused infringer, and as the Federal Circuit resoundingly reaffirmed, *there is no affirmative obligation to obtain opinion of counsel*:  "Because we abandon the affirmative duty of due care, we also reemphasize that there is no affirmative obligation to obtain opinion of counsel." Id. at *22.  In other words, the mere absence of a an opinion of counsel is not sufficient evidence to prove by a clear and convincing evidence that Vonage ignored an objectively-defined risk that it was infringing the Patents-in-Suit, *i.e.*, the first prong of the Seagate willfulness test.

### B.     Sprint's Evidence of Subjective Recklessness is Insufficient as a Matter of Law.

Assuming, *arguendo*, that Sprint identifies other new evidence sufficient to satisfy the first prong of the Seagate willfulness test, there still is no evidence that Vonage knew or should

have known of an "objectively-defined risk" that it was infringing the Patents-in-Suit.  To date,

the only evidence of "notice" identified by Sprint is a series of licensing letters that Sprint sent to

Vonage prior to this litigation.  In these letters, Sprint identified 43 "representative" patents

totaling nearly 2000 claims and invited Vonage to engage in licensing negotiations.  (See Defs.'

Mot. *in Limine* to Preclude Sprint's Pre-Litigation Letters, Doc. 283-84).  However, Sprint did

not provide claim charts or any other explanation as to why it believed that Vonage was

infringing any claim of any of the 43 loosely identified patents, or identify what Vonage system,

or aspect thereof, it considered to infringe its patents.  For the reasons discussed in Vonage's

Motion *In Limine*, these letters do not even provide legally sufficient notice of infringement to

Vonage and, therefore, they cannot be found to have put Vonage on notice that its actions

amounted to a reckless disregard for Sprint's patent rights.

The Federal Circuit has left it up to this Court to apply the new recklessness standard for

willfulness that it announced in Seagate.  See id. at *23.  In this case, the lack of willfulness

evidence can lead to only one conclusion under the Seagate standard.  Simply put, Sprint has not

identified and cannot introduce at trial sufficient evidence to satisfy its burden to show (a) an

"objectively high risk" of infringement by Vonage and (b) that such a risk was known, or should

have been known, by Vonage.

**C.    The Law of the Case Doctrine Likewise Precludes a Finding of Willful Infringement.**

The findings in this Court's summary judgment order preclude a finding that Vonage

willfully infringes the Asserted Patents.  By its Memorandum & Order of August 7, 2007, the

Court found: (1) that Vonage did not literally infringe any of the asserted claims of the '301

Patent Family, (2) that Vonage did not literally infringe an additional 5 of the asserted claims of

the '605 Patent Family, (3) that entire call scenarios did not infringe any of the Asserted Patents,

and (4) that there remains a genuine issue of material fact with respect to Sprint's claims of

infringement.[2]  For the purpose of the <u>Seagate</u> willfulness test, these findings are effectively

equivalent to a finding that Vonage did not recklessly ignore an objectively-defined risk that its

system infringed the Patents-in-Suit.  In other words, there can be no objectively-defined risk of

infringement if there has been a finding no literal infringement or that infringement remains a

fact issue.  <u>See Seagate</u>, 2007 U.S. App. LEXIS 19768 at *29-31 (that patentee doesn't seek or

obtain preliminary relief is proof of lack of objective recklessness in willfulness analysis); <u>see</u>

<u>also</u> <u>Viskase Corp. v. American Nat'l Can Co.</u>, 261 F.3d 1316, 1325 (Fed. Cir. 2001) (while

resolution of claim of infringement under doctrine of equivalents "require[d] trial," rulings

negating literal infringement required vacating findings of willful infringement); <u>ATD Corp. v.</u>

<u>Lydall, Inc.</u>, 159 F.3d 534, 539 (Fed. Cir. 1998) (district court properly granted summary

judgment of no literal infringement and no willful infringement, even when court found there

were genuine issues of material fact on the issue of infringement under the doctrine of

equivalents and the issue of validity that required trial by jury); <u>WMS Gaming Inc. v.</u>

<u>International Game Tech.</u>, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (holding of no literal

infringement "changes the picture" as to whether a claim for willful infringement may be

maintained; "avoidance of literal infringement is a fact to be considered in determining whether

there has been willful infringement.") (citation, punctuation omitted).  Vonage respectfully

submits the Court's rulings to date preclude Sprint from arguing that Vonage willfully infringed

the Asserted Patents.  <u>See, e.g.</u>, <u>Rohrbaugh v. Celotex Corp.</u>, 53 F.3d 1181, 1184 (10th Cir.

---

[2]    Furthermore, the Court has noted that its rulings are generally based on the
information available on the face of the Asserted Patents, with little consideration of Vonage's
litigation positions.

1995) (negligence claim could not be maintained based on previous ruling on foreseeability; based on law of case, threshold question of duty wasn't satisfied).

## IV.    THE ASSERTED CLAIMS ARE INVALID BECAUSE THEY ARE NOT ENABLED.

As an initial matter, Vonage hereby incorporates this Court's findings in its September 4, 2007 Memorandum and Opinion regarding the law applicable to Vonage's claim that the Asserted Patents are not enabled.  (See Doc. No. 351, at pp. 5-7).  As found by this Court, "the Federal Circuit has held that evidence regarding the absence of a commercial embodiment of a patented article is admissible as relevant to the disputed issue of enablement."  Id.  In fact, the Federal Circuit, in Ormco Corp. v. Align Technology, Inc., 2007 U.S. App. LEXIS 20185, (Fed. Cir. August 24, 2007), recently found that an inventor's failed attempts to enable his or her invention in a commercial products "is ***strong evidence*** that the patent specification lacks enablement."  Id. at *27 (emphasis added).

Furthermore, the Court found that "It is well settled, however, that the patent specification must enable those skilled in the art to make and use the 'full scope' of the claimed invention without undue experimentation."  (Doc. No. 351, at 7, citing Liebel-Flarsheim Co. v. Medrad, Inc., 481 F.3d 1371, 1379 (Fed. Cir. 2007); Liquid Dynamics Corp. v. Vaughan Co., 449 F.3d 1209, 1224 (Fed. Cir. 2006); Invitrogen Corp. v. Clontech Labs., Inc., 429 F.3d 1052, 1070 (Fed. Cir. 2005)).  And "[a]lthough enablement does not require the inventor to foresee every means of implementing an invention, the scope of the patent claims must be less than or equal to the scope of enablement.)  (Id. citing Invitrogen Corp., 429 F.3d at 1070-71).

In light of the Court's findings and the evidence in the record, if the Asserted Patents are interpreted to be sufficiently broad to encompass Vonage's connectionless VoIP system, they should be held invalid as a matter of law for lack of enablement.  If the accused system is found

to infringe, the patents are invalid unless they provide sufficient teachings to allow one of ordinary skill in the art to "make and use the 'full scope' of the claimed invention[, which necessarily must include Vonage's connectionless VoIP system,] without undue experimentation." (Doc. No. 351 at p. 7). The Asserted Patents, however, do not provide any such teachings. In fact, the teachings of the Asserted Patents are so deficient, they do not even enable one of ordinary skill in the art to make and use the ATM platform to which the claims are specifically directed, much less Vonage's connectionless VoIP system that is not even discussed in the Asserted Patents.

Under the code name JCS2000, Sprint attempted to design, manufacture and implement a platform using the inventions in the Asserted Patents. (Doc. 199 at 13). At trial, the evidence will show that after hundreds of man years and over $190,000,000 in investment, id., Sprint could not make the inventions claimed in the Asserted Patents even on the ATM platforms specifically disclosed in the patents and with which Sprint was fluent. In describing its wholesale abandonment of its development efforts, Sprint acknowledged that its JCS2000 project suffered from significant technical and developmental impediments and that remained unresolved at the time of its termination. Even in the rosy glow of hindsight, Sprint described the project as facing "vast" and "substantial technical uncertainty" at its inception in 1998, and "additional technical uncertainty" which evolved over time. See Sprint Research & Experimentation 1999 Tax Credit Study, SPRp-026-01-584 to 606, attached as Ex.J, at 3, 10-13. The fact that the Asserted Patents did not enable even the preferred embodiment of the claimed inventions, in the hands of Sprint, a company with the overwhelming resources, experience and motivation, is strong evidence that the Asserted Patents lack enabling language to make and use the accused Vonage system. See, e.g., Ormco, 2007 U.S. App. LEXIS 20185, *27 (a failed

28

attempt to commercialize an invention is strong evidence of lack of enablement); Novo Nordisk

Pharm., Inc. v. Bio-Technology Gen. Corp., 424 F.3d 1347, 1362 (Fed. Cir. 2005) (an inventor's

failed attempts to practice an invention are relevant evidence of non-enablement); Enzo

Biochem, Inc. v. Calgene, Inc., 188 F.3d 1362, 1372 (Fed. Cir. 1999) ("the record is replete with

the inventor's own failed attempts" to practice claimed invention).  Accordingly, if the Asserted

Patents are read on the accused Vonage system they are invalid.[3]

## V.    IF THE ASSERTED CLAIMS ARE CONSTRUED TO READ ON THE ACCUSED SYSTEM, THE CLAIMS ARE INVALID FOR FAILING TO COMPLY WITH THE WRITTEN DESCRIPTION REQUIREMENT.

If Vonage's VoIP System is found to infringe any claims of the Asserted Patents, as

construed, those claims must be found to be invalid on the basis that the corresponding Asserted

Patent(s) fails to meet the written description requirement of 35 U.S.C. § 112.  The Patent Act

requires that a patent contain a written description of the invention to be valid.  35 U.S.C. § 112;

LizardTech v. Earth Resource Mapping, Inc., 424 F.3d 1336, 1344-45 (Fed. Cir. 2005).

To satisfy the written description requirement, the patent "must describe the invention

sufficiently to convey to a person of skill in the art that the patentee had possession of the

claimed invention at the time of the application, *i.e.*, that the patentee invented what is claimed."

LizardTech, 424 F.3d at 1345.  The patentee must demonstrate in the specification that he

"possessed the ***full scope*** of the invention recited in [the] claim... ."  Id.  (emphasis added).  Very

---

[3]    Even assuming, *arguendo*, that Sprint can show that the Asserted Patents enable one embodiment within the scope of the claims, *viz.* an ATM platform, this would not be sufficient to satisfy the enablement requirement.  Where a claim encompasses two embodiments, the enablement of a single embodiment is not sufficient.  AK Steel Corp. v. Sollac, 344 F.3d 1234, 1244-45 (Fed. Cir. 2003) (construing claims to read on both Type 1 and Type 2 aluminum coating, but finding claims unenabled as specification did not teach how to make and use invention using Type 1 at time of filing given patentee's "own failures to make and use the later claimed invention in the time of the application, the district court correctly concluded that there was no genuine issue of material fact relating to undue experimentation as it relates to enablement.")

simply, the "claims may be no broader than the supporting disclosure" if they are to survive written description analysis. Gentry Gallery, 134 F.3d at 1480.

Neither of the two specifications of the Asserted Patents describe an invention that covers the accused Vonage system. First, the '301 Patent Family discloses only one kind of telecommunication system -- a system that connects narrowband voice communications to a broadband ATM network using an ATM interworking multiplexer. If any asserted claims of the '301 Patent Family are found to be infringed by the accused Vonage system, those claims must claim an invention that covers a connectionless VoIP system as opposed to a broadband ATM network. Since the specification of the '301 Patent Family does not disclose an invention covering a connectionless VoIP system, or any internet application, one of ordinary skill in the art could not be aware that the patentee had possession of ***the full scope of the invention*** disclosed in the claim that is infringed.

Second, the disclosure in the '605 Patent Family is limited to selecting network connections. If the claims are found to be infringed, the claims necessarily must have been found to claim an invention that reads on a connectionless network such as the Internet. Similar to the specification in LizardTech and Gentry Gallery, the '605 Family Patent's specification lacks a description sufficient to cover the claims as contorted to cover the accused system.

Based on the clear divergence between the scope of the disclosure and the scope of the claims, if there is a finding of infringement, the infringed claims of the '301 and '605 Patent Families are invalid under the written description requirement as a matter of law. See LizardTech, 424 F.3d at 1337 (finding invalidity for failing to meet written description requirement on summary judgment) and Gentry Gallery, 134 F.3d at 1479-80 (reversing finding of no invalidity on written description grounds).

Respectfully submitted,

BARBER EMERSON, L.C.

September 4, 2007                    By:     s/ Terrence J. Campbell
                                            Terrence J. Campbell – 18377
                                            tcampbell@barberemerson.com
                                            Catherine C. Theisen – 22360
                                            ctheisen@barberemerson.com
                                            1211 Massachusetts Street
                                            P.O. Box 667
                                            Lawrence, KS 66044
                                            (785) 843-6600
                                            (785) 843-8405 Facsimile

                                            s/ Donald R. McPhail
                                            Patrick D. McPherson
                                            Barry Golob
                                            Donald R. McPhail
                                            Duane Morris LLP
                                            1667 K Street N.W.
                                            Washington, DC 20006-1608
                                            202-776-7800
                                            pdmcpherson@duanemorris.com
                                            bgolob@duanemorris.com
                                            drmcphail@duanemorris.com

                                            L. Norwood Jameson
                                            1180 West Peachtree Street
                                            Atlanta, GA 30309
                                            404-253-6900

                                            *Attorneys for Defendants/Counterclaim
                                            Plaintiffs Vonage America, Inc. and Vonage
                                            Holdings Corp.*

DM1\1185263.2

# CERTIFICATE OF SERVICE

I hereby certify on September 5, 2007, that a copy of Defendants Vonage Holdings Corp. and Vonage America, Inc.'s Trial Brief was filed and served via the Court's electronic filing system:

> B. Trent Webb
> Adam P. Seitz
> Erick A. Buresh
> Shook, Hardy & Bacon LLP
> 2555 Grand Boulevard
> Kansas City, MO 64108-2613
> bwebb@shb.com
> aseitz@shb.com
> eburesh@shb.com
>
> *Attorneys for Plaintiff*
> *Sprint Communications Company L.P.*

>     /s/ Terrence J. Campbell    
> Attorney for Defendants